**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION**

CASE NO: 18-cv-60766-GAYLES/Seltzer

INTERIM HEALTHCARE INC.,

    Plaintiff,

        v.

SUNCOAST LOVING CARE, LLC,
CB MEDICAL, LLC, JOLANTA
IZMIRLIYAN and SEVAN ARTO
IZMIRLIYAN

    Defendants.
_____/

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION WITH INCORPORATED MEMORANDUM OF LAW

Plaintiff, Interim Healthcare Inc. ("Interim"), moves for an Order granting a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a). Interim terminated franchise agreements with the Defendants, Suncoast Loving Care, LLC ("SLC"), CB Medical, LLC ("CBM"), and Jolanta and Sevan Arto Izmirliyan (the "Izmirliyans"). SLC, CBM and the Izmirliyans are operating a competitive business, in violation of their non-compete obligations. Defendants are also infringing on Interim's trademarks and breaching the franchise agreements by using the telephone numbers associated with their former Interim Healthcare franchises (the "Franchisee Telephone Numbers"). Interim requests that the Court enjoin SLC, CBM, and the Izmirliyans from operating a competitive business within 100 miles of the office of other franchisees of Interim Healthcare Inc., and require that Defendants transfer the Franchisee Telephone Numbers to Interim.

Submitted in support of this motion is Plaintiff's Memorandum of Law in Support of its Motion for Preliminary Injunction, the Declaration of Steven Turner, and such evidence as may be presented at the hearing on this motion.

## **MEMORANDUM OF LAW**

**I.    INTRODUCTION**

Interim is the franchisor of the Interim Healthcare franchise system that provides nursing, therapy and non-medical home care, hospice and healthcare staffing services through over 300 franchisees throughout the United States.  SLC and CBM are former franchisees of Interim, and the Izmirliyans are the guarantors of SLC's and CBM's obligations under the parties' respective franchise agreements.

Interim seeks to enjoin the operation of a competitive business by SLC, CBM and the Izmirliyans in violation of the post-termination non-compete provisions contained in the parties' franchise agreements.  Interim also seeks to enjoin SLC's, CBM's and the Izmirliyans' use of the Franchisee Telephone Numbers in violation of the post-termination provisions contained in the parties' franchise agreements.

SLC, CBM and the Izmirliyans repeatedly failed to pay Interim the amounts due under their respective franchise agreements.  As a result, Interim served SLC, CBM and the Izmirliyans with notice of the default payment.  After SLC, CBM and the Izmirliyans failed to pay the amounts due, Interim terminated the franchise agreements.

The termination of the franchise agreements is not in dispute, but SLC, CBM and the Izmirliyans are operating a competitive business in violation of the non-compete provisions contained in the franchise agreements.  Defendants are also infringing on Interim's trademarks by utilizing the Franchisee Telephone Numbers in connection with that competitive business.  SLC,

CBM and the Izmirliyans are unlawfully causing irreparable harm to Interim's reputation and goodwill and are making it extremely difficult for Interim to locate a new franchisee to open in SLC's and CBM's former territories and serve Interim's customers there.  As a result, Interim seeks a preliminary and permanent injunction to enforce the non-compete provisions contained in the parties' franchise agreements and to enjoin the infringement of Interim's trademarks.

**II.     FACTS**

On August 1, 2013, Interim and Jolanta Izmirliyan entered into a franchise agreement (the "Manatee Franchise Agreement") pursuant to which Jolanta Izmirliyan was granted the right and undertook the obligation to operate an "Interim Healthcare" franchise in Manatee County, Florida (the "Manatee Territory").  The Manatee Franchise Agreement was assigned to SLC on August 12, 2013 (the "Assignment").  See Declaration of Steven Turner ("Turner Decl.") and Exhibit A, ¶ 11.

On April 26, 2013, CB Medial Corporation entered into a franchise agreement (the "Sarasota Franchise Agreement") pursuant to which CB Medical Corporation was granted the right and undertook the obligation to operate an "Interim Healthcare" franchise in Sarasota County, Florida (the "Sarasota Territory").  Id. at ¶ 13.  The Manatee Franchise Agreement and the Sarasota Franchise Agreement are collectively referred to as the "Franchise Agreements."

### The Franchise Agreements

Pursuant to the Franchise Agreements, the Izmirliyans personally guaranteed SLC's and CBM's non-compete obligations under the Franchise Agreements. Id. at ¶¶ 12, 14-15.

Pursuant to Section 12.1 of the Franchise Agreements on or about January 15th of each calendar year, Interim shall determine Franchisees' "Market Quota" for such calendar year and promptly notify Franchisees of the amount. Id. at ¶ 19.  The Market Quota is used to determine the

sales quota.  For example, for the calendar year 2016, the sales quota is 30% of the Market Quota.  Id.

Pursuant to Section 12.2 of the Franchise Agreements, if Franchisees' gross sales were less than the sales quota for any calendar years, Franchisees are required to pay Interim a sum equal to the difference between the gross sales and the sales quota for the calendar year, multiplied by a fraction.  Id. at ¶ 20.  The numerator of the fraction will equal the amount of weekly service charges payable to Interim based on Franchisees' actual sales during such calendar year, and the denominator of the fraction will be equal to Franchisees' actual sales during the same calendar year.  Id.  Any amount due pursuant to Section 12.2 of the Franchise Agreements must be paid with 30 days of Interim providing written notice of the amount due.   Id. at ¶ 21.

Pursuant to the restrictive covenant provisions contained in Sections 10(a)(i) and 10(b) of the Franchise Agreements, SLC, CBM and the Izmirliyans agreed:

> for a period ending eleven months after the expiration or other termination of this Agreement for any reason, or [his/her] share [of] ownership in Franchisee, whichever shall first occur, that they will not, directly or indirectly, individually or for any third party, without the prior written consent of [Interim], engage in any business or activity competitive to the business of providing the following services and products to any party: (1) temporary personnel to provide health care management, non-medical support, nursing or other health care related services, (2) hospice services, (3) permanent placement services with respect to health care related occupations, (4) "vendor on-premise" services, management services and similar services, and (5) pharmaceuticals, durable medical equipment, supplies and similar health care related products, or assist any competitor in any way to provide such services and products within a radius of one hundred miles from any office operated by [Interim] or its subsidiaries, affiliates, licensees or franchisees.

Id. at ¶ 24.

### SLC's Breach of the Manatee Franchise Agreement

On August 8, 2017, Interim served SLC with notice of default for failure to make payments due under the Manatee Franchise Agreement in the amount of $25,627 (the "SLC Notice of

Default"). Id. at ¶ 27. The SLC Notice of Default provided SLC with ten days to cure the default. Id.

SLC failed to cure the default and on August 22, 2017, Interim served SLC with a notice that the Manatee Franchise Agreement was terminated effective December 31, 2017, due to SLC's failure to timely cure its default referenced in the SLC Notice of Default (the "SLC Termination Notice"). Id. at ¶ 28. SLC does not dispute the Manatee Franchise Agreement was terminated by the SLC Termination Notice.

### CBM's Breach of the Sarasota Franchise Agreement

On August 8, 2017, Interim served CBM with notice of default for failure to make payments due under the Sarasota Franchise Agreement in the amount of $28,081 (the "CBM Notice of Default"). Id. at ¶ 31. The CMB Notice of Default provided CBM with ten days to cure the default. Id.

CBM failed to cure the default and on August 22, 2017, Interim served CBM with a notice that the Sarasota Franchise Agreement was terminated effective December 31, 2017, due to CBM's failure to timely cure its default referenced in the CBM Notice of Default (the "CBM Termination Notice"). Id. at ¶ 32. CBM does not dispute the Sarasota Franchise Agreement was terminated by the CBM Termination Notice. Id. at ¶ 33.

### SLC's, CBM's and the Izmirliyan's Breach of Their Post-Termination Non-Compete Obligations

On January 23, 2018, Interim served SLC, CBM and the Izmirliyans with notice it was unlawfully competing against Interim in violation of Sections 10(a)(i) and 10(b) of the Franchise Agreement (the "Demand Notice"). Pursuant to the Demand Notice, Interim demanded that SLC,

CBM and the Izmirliyans cease and desist operating the competitive business in violation of the Franchise Agreement. Id. at ¶ 35.

SLC, CBM and the Izmirliyans have not complied with the Demand Notice and continue to operate a competitive business in violation of Sections 10(a)(i) and 10(b) of the Franchise Agreements. Id. at ¶ 36. SLC, CBM and the Izmirliyans are servicing customers that are within 100 miles of Interim's other franchisees in Florida. Id. at ¶ 68.

SLC, CBM and the Izmirliyans have not complied with the Demand Notice because they also continue to utilize the Franchisee Telephone Numbers in connection with the operation a competitive business in violation of Section 17.2 of the Franchise Agreements. Id. at ¶ 37. SLC's, CBM's and the Izmirliyans' use of the Franchisee Telephone Numbers, which were advertised under Interim's trademarks, is likely to cause confusion as to the sponsorship, affiliation, or authorization by Interim. Id. at ¶ 44.

SLC, CBM and the Izmirliyans are damaging the customer goodwill and reputation built up under Interim's trademarks and proprietary system and they are interfering with Interim's ability to maintain a market presence in the Manatee County and Sarasota County, Florida areas. Id. at ¶¶ 46, 49 and 69.

Interim seeks to protect its existing franchise relationships while it attempts to locate a new franchisee for the Manatee Territory and Sarasota Territory during the next eleven months. Id. at ¶ 70. If SLC, CBM and the Izmirliyans are permitted to continue operating their competitive business and use the Franchisee Telephone Numbers, Interim will not be able to locate a new franchisee while the former franchisee is there competing against the new franchisee.

## III. INTERIM IS ENTITLED TO PRELIMINARY INJUNCTIVE RELIEF.

The Court should preliminarily enjoin SLC, CBM and the Izmirliyans from continuing to operate their competitive business and using the Franchisee Telephone Numbers in violation of the non-compete and post-termination provisions in the Franchise Agreements.

A preliminary injunction may be granted if the movant demonstrates that: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. America's Health Ins. Plans v. Hudgens, 742 F.3d 1319, 1329 (11th Cir. 2014). Here, all factors weigh strongly in favor of granting the Plaintiff preliminary injunctive relief.

### A. The Plaintiff is likely to succeed on the merits of its claims.

#### 1. Breach of the non-compete

Section 542.335 of the Florida Statutes governs the enforceability of non-compete agreements[4]. Specifically, Section 542.335(1)(b) makes restrictive covenants in franchise agreements enforceable when they are reasonably limited in terms of time and area, and further legitimate business interests. Id.; see also Winmark Corp. v. Brenoby Sports, Inc., 32 F. Supp. 3d 1206, 1219 (S.D. Fla. 2014). Florida law requires courts to "construe a restrictive covenant in favor of providing reasonable protection to all legitimate business interests established by the person seeking enforcement," and prevents courts from employing "any rule of contract construction that requires the court to construe a restrictive covenant narrowly, against the restraint, or against the drafter of the contract." § 542.335(1)(h), Fla. Stat.

---

[4] Pursuant to Section 19 of the Franchise Agreement, the Franchise Agreement is governed by Florida law.

### a. An eleven-month time limitation is presumed reasonable under Florida law.

The time limitation on the restrictive covenant contained in the Franchise Agreements is for eleven months. Turner Decl. and Ex. A, ¶ 24. "In the case of a restrictive covenant concerning a former franchisee, the 'court shall presume reasonable in time any restraint one year or less in duration.'" Winmark Corp., 32 F. Supp. 3d at 1219; quoting § 542.335(d)(2), Fla. Stat. Because the time component of the non-compete is for less than one year, this Court should presume it to be reasonable.

### b. The non-compete is designed to protect legitimate business interests.

Next, the restrictive covenant is necessary to protect Interim Healthcare's legitimate business interests. "Legitimate business interests" "include trade secrets, valuable confidential business information, substantial relationships with specific prospective or existing customers, customer goodwill, and extraordinary or specialized training." Winmark Corp., 32 F. Supp. 3d at 1219. Additionally, courts have held that restrictive covenants are enforceable to give a franchisor time and protect their ability to re-license the territory and to protect other franchisees in the system. Winmark Corp., 32 F. Supp. 3d at 1219.

Here, the non-compete is designed to protect the legitimate business interests of Interim. The purpose of the non-compete is to protect Interim's goodwill and its relationships with prospective and existing customers that can be served by a new franchisee or current franchisees in the area during the search to locate a new franchisee for the Manatee Territory and Sarasota Territory. Turner Decl. and Ex. A, ¶¶ 70. To further that end, the non-compete is necessary to give Interim Healthcare the time to locate a replacement franchisee for the Manatee Territory and Sarasota Territory. Id. Finally, it is also specifically crafted to protect its other franchisees by giving them a protective zone

8

of 100 miles to service customers that are less than a two-hour drive from their office location in each direction.

In <u>Winmark Corp.</u>, <u>supra</u>, the franchisor of Play It Again Sports stores sought to enforce two non-compete clauses against its former franchisee that prohibited the former franchisee from competing with Play It Again Sports stores for one year after the termination of the franchise agreement between them. 32 F. Supp. 3d at 1219. The court enforced the non-compete noting that:

> Winmark provided confidential business information to Defendants, including the DRS software and instructions for how the store must be operate. Winmark has also established a legitimate business interest in protecting its franchise system, customer goodwill, and existing franchise relationships.

<u>Id.</u> The court also noted that enforcing the non-compete and protecting Winmark's legitimate business interest provided Winmark with the time and ability to protect other franchisees. <u>Id.</u>

Here, the non-compete is designed to protect several business interests similar to those in <u>Winmark Corp.</u> First, Interim seeks to protect its trade secrets and proprietary information disclosed to SLC, CBM and the Izmirliyans pursuant to the Franchise Agreements. <u>Id.</u> at ¶ 73.

Second, Interim seeks to protect the customer goodwill that was built up in the Territory that is associated with its trademarks and its proprietary system. <u>Id.</u> at ¶¶ 31-32.

Finally, Interim seeks to protect its existing franchise relationships while it attempts to locate a new franchisee for the Territory during the next eleven months. <u>Id.</u> If SLC, CBM and the Izmirliyans are permitted to continue to compete, they will interfere with the neighboring franchisees and make it very difficult for Interim to locate a new franchisee interested in servicing the Manatee Territory and Sarasota Territory. It will be very difficult for new franchisees to establish a business with the former franchisee competing against them using the same system and customer goodwill

built up under the Interim trademarks. Accordingly, the non-compete seeks to protect several legitimate business interests.

### c. The geographical scope of 100 miles radius is reasonable.

The 100 mile scope of the non-compete is reasonable. Interim only seeks to enforce the non-compete within a 100-mile radius of the competing business' address at 6703 14th Street West, Suite 208, Bradenton, Florida 34207 (the "Premises") and the offices of the other Interim franchisees in the Tampa, Florida and Fort Myers, Florida areas. The non-compete specifically limits SLC's, CBM's and the Izmirliyans' ability to compete against Interim's franchisees to a radius of 100 miles from each office operated by Interim, its subsidiaries, affiliates, licensees or franchisees.

With regard to Interim's request to enjoin SLC's, CBM's and the Izmirliyans' operation of the competitive business in their former territories, the non-compete is silent on the geographical scope, which would suggest it was designed to apply globally. Interim, however, does not seek to enforce the non-compete on a global scale because it does not dispute such a geographical scope would be unreasonable. Instead, Interim only seeks to enforce the non-compete within a 100-mile radius of the Premises to make it consistent with the rest of the non-compete and, therefore, reasonable. The Court has the authority to "blue pencil" the non-compete to accommodate Interim's request. See Health Care Fin. Enterprises, Inc. v. Levy, 715 So. 2d 341, 342 (Fla. Dist. Ct. App. 1998) (holding a court may "blue pencil" an unreasonable non-compete to make it enforceable); Sears Termite & Pest Control, Inc. v. Arnold, 745 So. 2d 485, 486 (Fla. Dist. Ct. App. 1999) ("When such an agreement is otherwise valid but lacks a geographic restriction, the courts should supply a reasonable restriction").

Here, a 100-mile radius as the geographical scope of the non-compete is reasonable given the circumstances. The Manatee Territory under the Manatee Franchise Agreement includes all of

Manatee County and the Sarasota Territory under the Sarasota Franchise Agreement includes all of Sarasota County (which is a distance of approximately 55 miles). The non-compete Interim seeks to enforce covers the Manatee Territory and Sarasota Territory granted to SLC, CBM and the Izmirliyans under the Franchise Agreements, as well as the territories of neighboring franchisees. Further, many Interim franchisees are granted territories that span a distance of 100 miles. Thus, the 100-mile geographical scope covers what is a reasonable geographical area for a competitive business to service.

Interim currently has franchisees located in neighboring Charlotte County, Hillsborough County, Pinellas County, Pasco County and Hernando County, each of which have an office within 100 miles of the Premises, the Manatee Territory and the Sarasota Territory. SLC, CBM and the Izmirliyans are servicing customers that are within 100 miles of Interim's other franchisees in Charlotte County, Hillsborough County, Pinellas County, Pasco County and Hernando County. As a result, it is reasonable and necessary to protect a radius of 100 miles to protect its franchisees in the area and to give Interim the opportunity to place new franchisees in the Manatee Territory and Sarasota Territory to serve customers that were formerly served by SLC and CBM.

Courts in Florida have upheld non-competes with similar geographical limitations. See, e.g., Graphic Bus. Sys., Inc. v. Rogge, 418 So. 2d 1084, 1087 (Fla. Dist. Ct. App. 1982) (finding agreement not to compete for two years after termination of employment within 75 miles of the city was reasonable in both time and area); Allied Universal Corp. v. Given, No. 3D16-1128, 2017 WL 1018502, at *1 (Fla. Dist. Ct. App. Mar. 15, 2017) (reversing the trial court's denial of an injunction with instructions to enter an order enjoining the former employee from competing where the geographical scope was 150 miles); Kenco Chem. & Mfg. Co. v. Railey, 286 So. 2d 272, 273 (Fla. Dist. Ct. App. 1973) (upholding trial court's modification of non-compete to limit the area to the

entire state of Florida and within 100 miles of the areas in Georgia where the former employer did business); AmeriPath, Inc. v. Wetherington, No. 10-60766-CIV, 2011 WL 1303804, at *7 (S.D. Fla. Apr. 4, 2011) (enforcing a non-compete with a radius of 100 miles); Royal Floral Distributors, Inc. v. Karukin, 625 So. 2d 1307, 1308 (Fla. Dist. Ct. App. 1993) (enforcing a non-compete with a 200 miles radius); AutoNation, Inc. v. O'Brien, 347 F.Supp.2d 1299, 1307–08 (S.D. Fla. 2004) (finding reasonable geographic restriction preventing employee from "working in any geographic space in which [employer] operates" where employer had interest in confidential information). Because the geographical scope Interim seeks to enforce is limited to 100 miles from the Premises and the offices of other franchisees, it is reasonable to protect Interim's legitimate business interest and the Court should enforce it.

### 2. Trademark infringement and assignment of the Franchisee Telephone Numbers.

In order to succeed in a claim for unfair competition or trademark infringement, the plaintiff must establish the following two elements: 1) valid ownership of the mark; and 2) the defendant's use of the mark in commerce create a likelihood of confusion among consumers as to the origin of the goods. See Alliance Metals, Inc. of Atlanta v. Hinely Indus., Inc., 222 F.3d 895, 906 (11th Cir. 2000). Applying these factors to the case at bar demonstrates Interim's strong likelihood of success on the merits.

First, Interim's trademarks are valid and legally protectable, as they have been properly registered in accordance with the Lanham Act, 15 U.S.C.A. § 1051 et seq. Second, SLC's, CBM's and the Izmirliyan's unauthorized use of the telephone numbers of their former Interim franchises, which telephone numbers were advertised in connection with the Interim trademarks, is likely to create confusion concerning the unauthorized services offered by SLC and CBM.

The Eleventh Circuit considers seven factors when determining whether or not a likelihood of consumer confusion exists: (1) type of mark; (2) similarity of mark; (3) similarity of the products the marks represent; (4) similarity of the parties' trade channels and customers; (5) similarity of advertising media; (6) the defendant's intent; and (7) actual confusion. <u>Frehling Enters., Inc. v. Int'l Select Grp., Inc.</u>, 192 F.3d 1330, 1335 (11th Cir. 1999). SLC, CBM and the Izmirliyans are using the Franchisee Telephone Numbers so that they may seamlessly continue to service the same customers of their former Interim Healthcare franchises and benefit from the association between the Franchisee Telephone Numbers and the goodwill and reputation of the Interim trademarks. SLC's, CBM's and the Izmirliyans' use of the Franchisee Telephone Numbers allows them to unfairly compete with neighboring Interim Healthcare franchisees by unlawfully benefitting from their association with the Interim trademarks. Weighing the factors favors a likelihood of confusion. Interim will be successful on its trademark infringement claim.

Additionally, Interim is entitled to the return of the telephone numbers pursuant to its breach of contract claim. Under Florida law, the elements of a breach of contract action are: (1) a valid contract; (2) a material breach; and (3) damages. <u>Beck v. Lazard Freres & Co., LLC</u>, 175 F.3d 913, 914 (11th Cir. 1999).

The parties do not dispute that the Franchise Agreements are valid contracts between the parties. Pursuant to Section 17.2 of the Franchise Agreements, SLC and CBM agreed "to execute and deliver to [Interim] any and all instruments necessary to affect assignment or other transfer of its telephone number(s) . . . to [Interim] or its designee upon [Interim's] written demand therefor." SLC and CBM failed to assign the Franchisee Telephone Numbers to Interim or its designee, despite Interim's demand for the same in the SLC Termination Notice and CBM Termination Notice.

Interim has been damaged by the confusion that SLC's and CBM's competing business is associated with Interim because they are using the Franchise Telephone Numbers, which were associated with the Interim trademarks and business system, in connection with and to market their competing business. Customers are likely completely unaware that Interim is no longer associated with SLC and CBM. Further, because SLC and CBM are no longer franchisees, Interim cannot ensure that they are operating pursuant to Interim's system standards and the association between Interim and SLC's and CBM's competing business is damaging Interim's reputation and goodwill in the market. Accordingly, Interim can establish all of the elements of its breach of contract claim and is likely to succeed on the merits of its claim.

### B. Absent preliminary injunctive relief, the Plaintiff will suffer irreparable injury.

"Irreparable harm means any serious injury that cannot be quantified, i.e., the party suffering the injury cannot be made whole by the payment of monetary damages alone." ABC Charters, Inc. v. Bronson, 591 F. Supp. 2d 1272, 1309 (S.D. Fla. 2008). The irreparable injury claimed "must be neither remote nor speculative, but actual and imminent." Winmark Corp., 32 F. Supp. 3d at 1223. Under Florida law, "[t]he violation of an enforceable restrictive covenant creates a presumption of irreparable injury to the person seeking enforcement of a restrictive covenant." Winmark Corp., 32 F. Supp. 3d at 1223; citing § 542.335(1)(i), Fla. Stat.; Proudfoot Consulting Co. v. Gordon, 576 F.3d 1223, 1231 (11th Cir. 2009).

As explained above, the restrictive covenant is enforceable and is designed to protect legitimate business interests such as the loss of goodwill and the former franchisee's use of Interim's proprietary system to compete against it. Therefore, under Florida law, there is a presumption of irreparable harm. Id.

Furthermore, the Eleventh Circuit has repeatedly held that "the loss of customers and goodwill is an 'irreparable' injury." Ferrero v. Associated Materials Inc., 923 F.2d 1441, 1449 (11th Cir. 1991); BellSouth Telecommunications, Inc. v. MCI Metro Access Transmission Servs., LLC, 425 F.3d 964, 970 (11th Cir. 2005); Arthur J. Gallagher Serv. Co. v. Egan, 514 F. App'x 839, 843 (11th Cir. 2013).

Here, SLC, CBM and the Izmirliyans continue to service the same customers they serviced in the Manatee Territory and Sarasota Territory as franchisees of Interim, and are using the same telephone numbers as their former Interim franchisees in violation of their non-compete and post-termination obligations, but they do so now under a different brand. As a result, SLC, CBM and the Izmirliyans are damaging the goodwill and reputation built up under Interim's trademarks and proprietary system and they are interfering with Interim's ability to maintain a market presence in the Manatee and Sarasota County area. SLC, CBM and the Izmirliyans are causing Interim actual and immediate irreparable harm and a preliminary injunction is the only means available to prevent further harm to Interim and to preserve the status quo.

### C.  Any self-inflicted harm to SLC, CBM and the Izmirliyans is outweighed by the irreparable harm to Interim.

"To grant injunctive relief, the Court must weigh the potential harm to both Plaintiff and Defendants. Generally, a franchisee that has breached the terms of its franchise agreement cannot then complain of harm from an injunction preventing further violations of the agreement." Winmark Corp., 32 F. Supp. 3d at 1223; citing Dunkin' Donuts Franchised Restaurants LLC v. D & D Donuts, Inc., 566 F. Supp. 2d 1350, 1361 (M.D. Fla. 2008); Burger King Corp. v. Majeed, 805 F. Supp. 994, 1005 (S.D. Fla. 1992).

Here, the harm to Interim is outweighed by any self-inflicted harm that may result to SLC, CBM and the Izmirliyans. Interim is experiencing irreparable harm to its goodwill, franchise relationships, and its proprietary system and trade secrets while any harm that may result to SLC, CBM and the Izmirliyans are a direct result of their failure to comply with their payment obligations under the Franchise Agreements. Accordingly, any self-inflicted harm to SLC, CBM and the Izmirliyans is substantially outweighed by the irreparable harm to Interim.

### D. The public interest weighs in favor of the preliminary injunction.

"Public policy in Florida favors enforcement of reasonable covenants not to compete." Winmark Corp., 32 F. Supp. 3d at 1224; citing Autonation, Inc., 347 F. Supp. 2d at 1308; see also § 542.335, Fla. Stat.

Here, the public interest will be served by enforcing SLC's, CBM's and the Izmirliyans' post-termination non-compete obligations and post-termination obligation to transfer the Franchisee Telephone Numbers. The public interest is served by enforcing the terms of a freely negotiated contract provision and by enforcing a non-compete and telephone number transfer obligation if it will prevent unfair competition, trademark infringement and misappropriation of good will and trade secrets. Id. Consequently, this factor also weighs in favor of granting Interim's request for a preliminary injunction.

### IV. CONCLUSION

SLC, CBM and the Izmirliyans are continuing to operate their business in competition with Interim and its franchisees in violation of their non-compete obligations under the Franchise Agreements, and are infringing on Interim's trademarks by using the telephone numbers associated with their former franchises and advertised in association with Interim's trademarks. Their unlawful actions are causing irreparable harm to Interim that can only be remedied by injunctive relief.

Enforcing the contractual obligations of the parties is in the public interest of Florida, and any harm to SLC, CBM and the Izmirliyans is self-inflicted and outweighed by the irreparable harm to Interim. Consequently, Interim respectfully requests that this Court enter a preliminary injunction to protect its contractual rights, goodwill and trade secrets.

Respectfully submitted,

By: /s/ *Shannon Kain*
SHANNON KAIN
Florida Bar No. 16656
HICKS, PORTER, EBENFELD & STEIN, P.A.
Sheridan Professional Centre
11011 Sheridan Street, Suite 104
Hollywood, FL 33026
Tel:   (954) 624-8700
Fax:   (954) 624-8064
skain@mhickslaw.com
kbrito@mhickslaw.com
eclerk@mhickslaw.com
*Local Counsel for Interim Healthcare, Inc.*

-and-

**FISHER ZUCKER LLC**
F. Joseph Dunn, Esquire (pro hac vice to be filed)
Priya Vimalassery, Esquire (pro hac vice to be filed)
21 South 21st Street
Philadelphia, PA 19103
Tel:   (215) 825-3100
Fax:   (215) 825-3101
jdunn@fisherzucker.com
pvimalassery@fisherzucker.com
*Attorneys for Interim Healthcare Inc.*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this **13th** day of **April, 2018**, a true and correct copy of the foregoing was filed with the Court's Electronic Case Filing system, and a copy will be personally served on the following Defendants, together with the Summons and Complaint:

Suncoast Loving Care, LLC
6703 14th Street West, Suite 208
Bradenton, Florida 34207

CB Medical, LLC
6703 14th Street West, Suite 208
Bradenton, Florida 34207

Jolanta Izmirliyan
1770 Ben Franklin Drive, #506
Sarasota, Florida 34236

Sevan Arto Izmirliyan
1770 Ben Franklin Drive, #506
Sarasota, Florida 34236

/s/ *Shannon Kain*
SHANNON KAIN